UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| AUTHENTIXX LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-CV-1599-B |
| | § | |
| PICKLEBALL OPCO LLC, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Pickleball OpCo LLC ("Pickleball")'s Motion to Dismiss (Doc. 17) made pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Plaintiff Authentixx LLC has filed a response (Doc. 18), and Pickleball has filed a reply (Doc. 19). For the reasons that follow, the Motion is **GRANTED**, and the case is **DISMISSED WITH PREJUDICE**.

## I.

## BACKGROUND

Authentixx owns U.S. Patent No. 10,355,863, which is titled "System and method for authenticating electronic content." Doc. 15, Am. Compl. ¶¶ 8–9. Pickleball (the party) operates a website for finding recreational pickleball (the sport) leagues and accessing other pickleball-related content. *See generally* Doc. 15-2, Am. Compl. Ex. 2. In this lawsuit, Authentixx has accused Pickleball's website of directly infringing the '863 Patent. *See* Doc. 15, Am. Compl. ¶¶ 26–30.

The '863 Patent "relates generally to computer security, and more particularly, to systems and methods for authenticating web pages and email messages." '863 Patent at 1:19–21. In

"conventional web page authentication systems," internet users could identify that they were on the webpage that they intended to visit by looking for "corporate logos, patterns, characters, symbols, or other indicators" associated with the legitimate website. Doc. 15, Am. Compl. ¶ 10 (quoting '863 Patent at 1:25–26). Think, for example, if you were to visit uscourts.gov and felt satisfied you were on the correct webpage by seeing the navy-and-white U.S. Courts logo in the top-left corner. But markers of authenticity (like the U.S. Courts logo) "can be copied and used to defraud a prospective customer." *Id.* (quoting '863 Patent at 1:30–31). And "'it is relatively easy for a "fraudster" to register a URL that is like the one the user is expecting, but is not quite the same,' creating situations where 'a user may retrieve an unwanted webpage that appears authentic.'" *Id.* (quoting '863 Patent at 1:33–35).

To address that problem, "the '863 Patent claims unconventional and inventive methods for web page authentication that integrate server-based authenticity key generation with client-side preference file management to create a robust, personalized authentication system." *Id.* ¶ 13. In slightly simpler terms, the '863 Patent envisions a "personalized verification mechanism" where the webpage's server displays a personalized authenticity stamp that the user knows to expect when visiting the webpage she intended to visit. *See id.* ¶ 17 (citing '863 Patent at 8:17–19).

The '863 Patent has 20 "claims," or distinct inventions, that it covers. *See* '863 Patent at 14:46 to 16:51. Only two of the '863 Patent's claims are mentioned in the Amended Complaint: Claim 9 and Claim 11. *See* Doc. 15, Am. Compl. ¶¶ 14, 16, 18–20, 22–23. Claim 9, which provides a method with eleven steps (labeled A–K below),[1] reads:

A method for authenticating at least one web page, the method comprising:

---

[1] Mark this point in the opinion for easy future access; the labeled steps will come up repeatedly in the Analysis section below.

[A] storing at least one authenticity stamp in a preferences file located in a file location;

[B] creating, by one or more designated servers, an authenticity key with information to locate the preferences file;

[C] receiving, at the one or more designated servers, a request from a client computer for the at least one web page;

[D] creating, by the one of more designated servers, formatted data corresponding to the requested at least one web page; and

[E] receiving, at the one or more designated servers, a request for the authenticity key used to locate the preferences file;

[F] sending, by the one or more designated servers, the formatted data to the client computer;

[G] providing, by the one or more designated servers, the authenticity key for processing to determine the file location of the preferences file;

[H] processing the authenticity key to determine the file location of the preferences file;

[I] locating the preferences file in the file location;

[J] retrieving the at least one authenticity stamp from the preferences file; and

[K] enabling the at least one authenticity stamp to be displayed with a representation of the formatted data on a display of the client computer.

'863 Patent at 15:24–51. Claim 11 depends on the method of Claim 9 and adds: "The method of Claim 9, wherein the file location is at least one of a random directory and a location not readily known in order to obscure the location of the preferences file." *Id.* at 16:3–6.

Authentixx attached to its Amended Complaint a chart with Claim 9's language, annotated screenshots from Pickleball's website showing where certain claim terms were allegedly practiced,

and some added description of how Pickleball's website allegedly infringes Claim 9. *See generally* Doc. 15-2, Am. Compl. Ex. 2. The "authenticity stamp" on Pickleball's website is allegedly a small image of the user. *Id.* at 2–3. For Step A, the "authenticity stamp" is stored "in a preferences file (e.g., user profile file) located in a file location (e.g., location of the user image in [pickleball.com's] server . . . )." *Id.* at 2. Pickleball's website, through its server, allegedly practices Step B by creating an "authenticity key (e.g., key related to the URL)"—which is visually represented as a portion of a URL string—"with information to locate the preferences file (e.g., user profile file)." *Id.* at 4–5. Steps C, D, and F allegedly happen when Pickleball's website receives a request from a user for certain webpage content (e.g., a search for pickleball leagues), creates "formatted data . . . corresponding to the request[]" (e.g., information about pickleball leagues), and then displays that information to the user. *See id.* at 5–7, 9–10. Apparently at the same time, in Steps E, G, H, I, J and K, Pickleball's website receives a request for the authenticity key, provides the authenticity key for processing, processes it to determine the location of the preferences/user file, locates the preferences file, retrieves the authenticity stamp therefrom, and then displays the authenticity stamp to the user on the same webpage with the formatted data. *Id.* at 8, 11–19. To summarize, the user sees two things at once on the webpage: the generic information about pickleball that she wants and a small image of herself that verifies that she is on pickleball.com and not some spoof website like piclebaal.com.

After Authentixx filed its original Complaint, Pickleball moved to dismiss on grounds that the '863 Patent is ineligible for patent protection and that Authentixx failed to plausibly allege infringement. *See generally* Doc. 11, Mot. Dismiss. Authentixx amended its complaint by adding allegations to overcome Pickleball's ineligibility argument. *Contrast* Doc. 15, Am. Compl. ¶¶ 9–24 (alleging details about the prior art and the '863 Patent's improvements thereon), *with* Doc. 1,

Compl. (not containing such allegations). Pickleball's second motion to dismiss is based on the same grounds as before: ineligibility and non-infringement. *See generally* Doc. 17, Mot. Dismiss. The Court considers the second motion to dismiss below.

## II.

## LEGAL STANDARD

Fifth Circuit law governs the procedural question of whether Authentixx stated a plausible patent infringement claim. *See Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1259 (Fed. Cir. 2018) (citation omitted). The standard should be familiar: Rule 12(b)(6) allows a defendant to move to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In considering whether the plaintiff has stated a claim, courts must "accept all factual allegations in the complaint as true" and "draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citations omitted).

Within this familiar inquiry, Federal Circuit law applies to all "substantive issues of patent law." *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015) (citation omitted). That includes the two grounds for Rule 12(b)(6) dismissal asserted here: patent ineligibility and non-infringement.

For patent ineligibility, all "patents granted by the Patent and Trademark Office are presumptively valid." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019) (citing

*Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 (2011)). Nevertheless, a defendant can attempt to overcome the "presumption of validity" by "prov[ing] that the patent never should have issued in the first place." *Id.* (internal quotation mark omitted) (quoting *Microsoft*, 564 U.S. at 96–97). Patent "[e]ligibility under 35 U.S.C. § 101 is a question of law, based on underlying facts." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (citations omitted). "Like other legal questions based on underlying facts, this question may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion where the undisputed facts, considered under the standards required by that Rule, require a holding of ineligibility under the substantive standards of law." *Id.* (collecting cases).

The other asserted ground for dismissal—non-infringement—also requires reference to Federal Circuit law. *See AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 35 (Fed. Cir. 2024) (citation omitted) ("We apply our own law to the specific question of whether a complaint states a claim of patent infringement on which relief may be granted."). "[A]n adequate complaint need only contain 'some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim.'" *Id.* (citation omitted). But if a court determines that a patent is invalid due to ineligibility, the court should not make a determination on infringement because it would "constitute[] an impermissible advisory opinion." *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718 (Fed. Cir. 2014) (Mayer, J., concurring) (citing *Oil, Chem. & Atomic Workers Int'l Union v. Missouri*, 361 U.S. 363, 367 (1960)).

### III.

### ANALYSIS

The '863 Patent claims a patent-ineligible abstract idea and is therefore invalid. To explain why, the Court first summarizes relevant portions of the legal framework for assessing patent

eligibility. Next, the Court analyzes the '863 Patent and Authentixx's allegations according to that framework. Finally, the Court addresses why leave to amend would be futile.

A.    *Assessing Patent Eligibility Involves a Two-Step Analysis.*

"Section 101 of the Patent Act defines the subject matter eligible for patent protection." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). Section 101 has four categories of patentable subject matter: "any new and useful [1] process, [2] machine, [3] manufacture, or [4] composition of matter." A patent may also be issued for "any new and useful improvement" in one of those four categories. § 101. "Other than as so limited, the patent system is described as available to 'anything under the sun that is made by man.'" *Internet Pats. Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1345 (Fed. Cir. 2015) (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980)).

But § 101 "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 573 U.S. at 216 (citation omitted). Those three patent-ineligible concepts are "the basic tools of scientific and technological work." *Id.* (citation omitted). To grant someone the exclusive right to a law of nature, natural phenomenon, or abstract idea would lead to "monopolization" that "might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." *Id.* (internal quotation marks and alteration omitted) (other citation omitted) (citing U.S. Const., art. I, § 8, cl. 8); *see* U.S. Const., art. I, § 8, cl. 8 ("The Congress shall have Power . . . [t]o promote the Progress of Science and useful Arts . . . ."). Monopolization of these patent-ineligible concepts would be harmful because, as "the building blocks of human ingenuity," the concepts are *in* every patentable invention. *See Alice*, 573 U.S. at 217 (citation omitted).

Marking the line between patent-ineligible abstract ideas and patent-eligible processes invented using those ideas has proven to be a challenging task for courts. *See Internet Pats.*, 790 F.3d at 1345. Because many patents are "drafting effort[s] designed to monopolize" abstract ideas, *see Alice*, 573 U.S. at 221 (citation omitted), courts conducting an eligibility analysis under § 101 must be careful not to be "deceived by the 'draftsman's art.'" *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016) (quoting *Alice*, 573 U.S. at 226). To help lower courts conduct the analysis, the Supreme Court in *Alice* established a two-step analytical framework. *See* 573 U.S. at 217–18.

1.    *Alice* Step One

Step one is to "determine whether the claims at issue are directed to one of [the] patent-ineligible concepts," such as abstract ideas. *Id.* at 217 (citation omitted). What the patent claims are "directed to" involves "looking at the 'focus' of the claims, their 'character as a whole.'" *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (citations and internal quotation marks omitted). More concretely, the inquiry requires identifying "what the patent asserts to be the 'focus of the claimed advance over the prior art.'" *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1097 (Fed. Cir. 2021) (quoting *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019)). When conducting the "directed to" inquiry, a court must be careful not to generalize too broadly because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Solutran*, 931 F.3d at 1168 (quoting *Mayo Collab. Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 71 (2012)). A court does not err, however, in identifying a "focus" of the claims that is "directly tethered to the claim language." *Id.*

Once a court has identified the claims' "focus," a court must determine whether that "focus" is a patent-ineligible concept. "The inquiry often is whether the claims are directed to 'a specific means or method' for improving technology or whether they are simply directed to an abstract end-result." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) (citing *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016)). "Limiting the invention to a technological environment does 'not make an abstract concept any less abstract under step one.'" *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (quoting *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017)). Neither does "[a]dding one abstract idea . . . to another abstract idea . . . render the claim non-abstract." *RecogniCorp*, 855 F.3d at 1327.

Not all claims directed to computer software are inherently abstract. *See Enfish*, 822 F.3d at 1335 (Fed. Cir. 2016). Software-directed claims can be non-abstract if they are "directed to an improvement in computer functionality"—i.e., "a specific implementation of a solution to a problem in the software arts." *See id.* at 1335, 1339. "In cases involving authentication technology, patent eligibility often turns on whether the claims provide sufficient specificity to constitute an improvement to computer functionality itself." *Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1346 (Fed. Cir. 2021).

At step one, the Federal Circuit and Supreme Court "have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish*, 822 F.3d at 1334. As relevant to this case, when a patent claim "recites a method . . . using result-based functional language . . . but does not describe how to achieve these results in a non-abstract way," the claim is directed to a patent-ineligible abstract idea. *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (citation omitted).

2.    _Alice Step Two_[2]

Step two—which should be reached only if a court determines at step one that the patent's claims are directed to an abstract idea—prompts the court to ask, "[w]hat else is there in the claims before us?" _Alice_, 573 U.S. at 217 (citation omitted). "To answer that question, [a court] consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." _Id._ (quoting _Mayo_, 566 U.S. at 79, 78). Step two is the "search for an 'inventive concept.'" _Id._ at 217 (citation omitted). "An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer." _BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC_, 827 F.3d 1341, 1349 (Fed. Cir. 2016) (citing _Alice_, 573 U.S. at 222–23).

A patent is ineligible for protection when the patent's claims entirely lack concepts that could be considered inventive.[3] _See, e.g., Two-Way Media_, 874 F.3d at 1338–39. A claim directed to the abstract idea of solving a technical problem has no inventive concept if it "only uses generic functional language to achieve the[] purported solutions." _Id._ at 1339. "Inquiry therefore must turn to any requirements for _how_ the desired result is achieved." _Id._ (quoting _Elec. Power Grp._, 830 F.3d at

---

[2] As you read this subsection, if parts of step two's framework sound the same as step one, that is somewhat by design. "[T]he two stages involve overlapping scrutiny of the content of the claims," and "there can be close questions about when the inquiry should proceed from the first stage to the second." _Elec. Power Grp._, 830 F.3d at 1353 (citations omitted). Think of step two as a "lifeline" providing for more rigorous scrutiny after a patent fails step one. _See CosmoKey_, 15 F.4th at 1100 (Reyna, J., concurring).

[3] Step two "'might sometimes overlap' with other fact-intensive inquiries like novelty under [35 U.S.C.] § 102." _Berkheimer_, 881 F.3d at 1368 (quoting _Mayo_, 566 U.S. at 90). As background, besides the requisites for patent _eligibility_ under § 101, an invention must also meet certain additional requirements for _validity_, such as being something novel and non-obvious to those in the field. _See_ 35 U.S.C. §§ 102, 103. If a patent contains _arguably_ inventive concepts, determining whether they are _actually_ inventive can require factually determining whether those concepts were "well-understood, routine, [or] conventional" in the field prior to the patent's issuance. _See Berkheimer_, 881 F.3d at 1369.

1355). Mere "invocations of computers and networks that are not even arguably inventive are 'insufficient to pass the test of an inventive concept in the application' of an abstract idea." *Elec. Power Grp.*, 830 F.3d at 1355 (citations omitted).

As a wrap-up description of this rule, the Federal Circuit has approved the "important common-sense distinction between ends sought and particular means of achieving them, between desired results (functions) and particular ways of achieving (performing) them." *Id.* at 1356. When a patent's claims are "so result-focused, so functional, as to effectively cover any solution to an identified problem," it "confirms . . . that the claims at issue fail to meet the standard for patent eligibility under § 101." *Id.* In such cases, the claimed method is "'so abstract and sweeping' as to cover any and all uses of" the abstract idea. *See Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014) (quoting *Gottschalk v. Benson*, 409 U.S. 63, 68 (1972)). Preserving an exclusive right to such an idea would allow the innovation-impeding monopolization of which the Supreme Court warned in *Alice*. *See* 573 U.S. at 216.

B.      *The '863 Patent is Ineligible for Patent Protection.*

Before diving into the two-step eligibility analysis, the Court first narrows the '863 Patent down to two representative claims: Claims 9 and 11. Second, the Court assesses those claims at *Alice* step one and determines that they are directed to the abstract idea of authenticating a webpage by simultaneously displaying generic content with a user-specific symbol using a series of abstract result-based functional steps. Finally, the Court engages *Alice* step two and concludes that the '863 Patent is ineligible for patent protection because it contains no inventive concept to transform the patent-ineligible abstract idea into a patent-eligible application of the idea.

1.    Claim 9 and Claim 11 are Representative of the '863 Patent.

Despite the general rule that courts should consider all the claims when analyzing eligibility, *see Solutran*, 931 F.3d at 1166 (citing *Alice*, 573 U.S. at 218 n.3), "[c]ourts may treat a claim as representative in certain situations." *Berkheimer*, 881 F.3d at 1365 (citations omitted). Those situations include "if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative." *Id.* (citations omitted). A claim may be treated as representative when all other claims are "substantially similar and linked to the same abstract idea." *Content Extract'n & Transm'n LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014).

Pickleball argues that Claim 9 is representative of all claims in the '863 Patent. *See* Doc. 17, Mot. Dismiss, 4–7. In support, Pickleball presents the other two independent claims—Claims 1 and 18—in a chart side-by-side with Claim 9. *See id.* at 5–6. All three independent claims have substantially identical steps that can be labeled A through K, as done for Claim 9 in the Background section of this opinion. *See id.* Among the three claims, the only differences are (1) an added or removed article "the" in Step B, (2) added or removed references to "the one or more designated servers" at various steps, and (3) exchanging the word "processing" in Claim 9's Step H with "manipulating" in Claim 1's Step H. *See id.*

In response, Authentixx only raises Claim 11 as adding something significant that is not in Claim 9. *See* Doc. 18, Resp., 15. Claim 11 adds that the "the file location"—which is where the file containing the authenticity stamp is stored in Claim 9's Step A—"is at least one of a random directory and a location not readily known in order to obscure the location of the preferences file." *See id.*

Pickleball argues in its reply that Claim 11's "'random directory' requirement is substantially similar" to Claim 9's Step A of "storing" the authenticity stamp. *See* Doc. 19, Reply, 3.

The Court will treat Claims 9 and 11 as the representative claims for its two-step eligibility analysis. Besides invoking Claim 11 as adding something significant, Authentixx has made no "argument for the distinctive significance" of other claims in the '863 Patent. *See Berkheimer*, 881 F.3d at 1365. Nor could it: the "minor changes in format or phrasing" in all the other claims make them "substantially similar," such that analyzing them each in depth would not alter the analysis below. *See Content Extract'n*, 776 F.3d at 1346, 1348. The Court credits for the sake of argument Authentixx's position that Claim 11 adds something that is not specifically present in Claim 9's Step A of storing the file containing the authenticity stamp somewhere. Claim 11, in essence, adds that the file should be stored somewhere *random*. In the analysis that follows, the Court will examine Claims 9 and 11 as the '863 Patent's representative claims.

   2.    At *Alice* Step One, the '863 Patent is Directed to the Abstract Idea of Authenticating a Webpage By Simultaneously Displaying Generic Webpage Content Alongside a User-Specific Symbol Using a Series of Abstract Result-Based Functional Steps.

To begin the analysis, the "focus" of the '863 Patent is displaying generic webpage content alongside an individualized symbol that is specific to a particular user as a means to authenticate a webpage. *See* '863 Patent at 15:24–51. In the prior art, according to Authentixx, a user could only verify that she was on the correct webpage through easily spoofed logos that were the same for everyone who accessed the webpage. *See* Doc. 15, Am. Compl. ¶ 10. The goal of displaying the webpage as envisioned by the '863 Patent is to assure a user that she is on the correct webpage by showing her a symbol that is unique to her. *See id.* ¶ 17 (citing '863 Patent at 8:17–19). Fulfilling

that goal is "what the patent asserts to be the 'focus of the claimed advance over the prior art.'" *See CosmoKey*, 15 F.4th at 1097 (citation omitted).

That "focus"—simultaneously displaying generic content and user-specific content on a webpage—is an "abstract end-result." *See RecogniCorp*, 855 F.3d at 1326 (citation omitted). However, that might not be the end of the *Alice* step-one analysis if the claims teach "a specific means or method" to reach that end-result. *See id.*

Lest the simultaneous-display characterization generalize the '863 Patent's focus too broadly, a closer examination reveals that fulfilling that goal involves eleven subordinate steps. *See CosmoKey*, 15 F.4th at 1097 (expressing skepticism at district court's "broad characterization" of patent's focus and suggesting closer look at steps to determine if claims contained "specific improvement in computer verification and authentication techniques" (citation omitted)). Steps A and B of the eleven-step method prepare for the remaining steps by "storing" the user's unique symbol—i.e., the "authenticity stamp"—in a "preferences file" and by "creating" an "authenticity key" to find the preference file location. Claim 11 adds onto Step A that the preference file location should be "random" and not "readily known" so that the location is "obscure." Then, in Steps C, D, and F, the website server "receiv[es] . . . a request" for a particular webpage, "creat[es] . . . formatted data corresponding to the requested" webpage, and "send[s] . . . the formatted data to the client computer"—this is the generic content a user would request to see. To get the "authenticity stamp" to also display on the client computer, the website server performs steps E, G, H, I, J, and K: it "receiv[es] . . . a request for the authenticity key," "provid[es] the authenticity key for processing," "process[es] the authenticity key to determine" the preferences file location, "locat[es] the preferences file," "retriev[es]" the "authenticity stamp from the preferences file," and "enabl[es]" the

"authenticity stamp to be displayed with a representation of the formatted data on a display of the client computer."

All eleven subordinate steps on the path to the simultaneous-display end-result use "result-based functional language" of the sort that the Federal Circuit has found to be directed to abstract ideas. *See Two-Way Media*, 874 F.3d at 1337. For example, in *Two-Way Media*, the patent's claim "require[d] the functional results of 'converting,' routing,' 'controlling,' monitoring,' and 'accumulating records,' but d[id] not sufficiently describe how to achieve these results in a non-abstract way." *Id.* The Federal Circuit has also found patent-ineligible "claims [that] broadly recited 'receiving' identity data of a client computer, 'authenticating' the identity of the data, 'authorizing' the client computer, and 'permitting access' to the client computer." *Universal Secure*, 10 F.4th at 1347 (quoting *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1016 (Fed. Cir. 2017)).

Like the result-based functional language of previous cases, none of the '863 Patent's steps describe *how* the result contained within each step should be reached. Step A says to "stor[e]" something in a "random," not "readily known" location, but it does not describe how exactly to choose the location besides the abstract notion that it should be random. For retrieving the authenticity stamp, the relevant steps say "receive a request," "provide" a key, "process" the key, "locate" the corresponding stamp, "retrieve" the stamp, and then "enable" it to be displayed. None of those result-based functional steps convey *how* to receive, provide, process, locate, retrieve, or enable in a way that would be "directed to a specific improvement to the way computers operate." *Enfish*, 822 F.3d at 1336. For the generic webpage content, insofar as relevant, the steps say to "receive requests," "create formatted data," then "send" it to the client computer, which likewise do

not convey or constrain how those results are accomplished. Thus, the '863 Patent is directed to an abstract end-result reached by a series of abstract result-based functional steps.

To avoid that conclusion, Authentixx primarily leans on *Ancora Technologies, Inc. v. HTC America, Inc.*, 908 F.3d 1343 (Fed. Cir. 2018). *See* Doc. 18, Resp., 14–15. In *Ancora*, the patented invention sought to introduce a new method for verifying licensed use of software programs. *See* 908 F.3d at 1344. It did so by "assigning certain functions to particular computer components and having them interact in specified ways." *Id.* at 1344–45. Specifically, the patent taught the use of "a modifiable part of the BIOS [Basic Input Output System] memory—not other computer memory—to store the information that can be used, when a program is introduced to the computer, to determine whether the program is licensed to run on that computer." *Id.* at 1345. "BIOS memory is typically used for storing programs that assist in the start-up of a computer," and it is "much harder" to hack than the types of memory used in the prior art to verify licensed use. *Id.*

The Federal Circuit in *Ancora* ruled that the patent "specifically identifie[d] how" to effectuate a "functionality improvement" in "an assertedly unexpected way." *Id.* at 1348. By using "a particular, modifiable, non-volatile portion of the computer's BIOS," the patent "rel[ied] on specific and unique characteristics of certain aspects of the BIOS that the patent asserts . . . were not previously used in the way now claimed." *Id.* at 1348–49. The result was "a beneficial reduction of the risk of hacking." *Id.* at 1349. But the patent did not merely state that result: instead, it had "the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it." *Id.* (quoting *SAP Am.*, 898 F.3d at 1167).

Authentixx argues that, "just as *Ancora* improved security by storing license records in a particular BIOS location, Claim 9 improves security by storing authenticity stamps in preference

files at specific obscured locations, with server-generated authenticity keys containing 'information to locate the preferences file.'" Doc. 18, Resp., 15. By storing the authenticity stamps at obscured locations and requiring an authenticity key to find those locations, the '863 Patent's method—according to Authentixx—"increases the difficulty in creating a general purpose rogue program for extracting preferences and keys." *Id.* (quoting '863 Patent at 12:3–5) (citing Doc. 15, Am. Compl. ¶¶ 13, 15).

Authentixx's attempted analogy to *Ancora* fails. Regardless how much Authentixx repeats the intended result of "obscuring" or adds in the label "specific," the '863 Patent does not teach a specific programming method to achieve the intended result. Unlike the '863 Patent's vague instruction to store the authenticity stamp somewhere "random," the patent in *Ancora* specified the exact part of the computer's memory to place the information. The benefit in *Ancora* yielded from that specific instruction; the purported benefit of "obscurity" here results from no specific technical step but just the abstract idea that the location should be random. Similarly, the idea that only an "authenticity key" can be used to find the authenticity stamp is just that, an idea. In contrast to the patent in *Ancora*, the '863 Patent lacks any computer programming specificity to "transform" its claim of a result into a claim of how to achieve it. *See* 908 F.3d at 1349 (citation omitted).

3.    At *Alice* Step Two, the '863 Patent Contains No Inventive Concept to Transform the Claims Into Patentable Subject Matter.

Much of the analysis on step two is already done: every step in the '863 Patent's eleven-step process uses "generic functional language to achieve the[ir] purported solutions." *See Two-Way Media*, 874 F.3d at 1339. In *Two-Way Media*, "the claim refer[red] to certain data 'complying with the specifications of a network communication protocol' and the data being routed in response to one or more signals from a user, without specifying the rules forming the communication protocol or

specifying parameters for the user signals." *Id.* Here, Claim 9 similarly refers to requests being received and data being stored, created, sent, provided, processed, located, retrieved, and enabled to be displayed—all without once specifying the rules or parameters. Claim 11 gets close to adding a parameter, but its addition is to do one step "randomly," which is itself an idea with no protocol or parameter.

On an inquiry of "*how* the desired result is achieved," *see Elec. Power Grp.*, 830 F.3d at 1355, the only answers from the '863 Patent are that the steps are done by a webpage's "servers." But "[s]tating an abstract idea while adding the words 'apply it with a computer'" does not carry a claim past *Alice* step two. *See Alice*, 573 U.S. at 223. "[S]uch invocations of computers and networks that are not even arguably inventive are 'insufficient to pass the test of an inventive concept in the application' of an abstract idea." *Elec. Power Grp.*, 830 F.3d at 1355 (citations omitted). Thus, closely examining steps A through K individually, none of them contains an arguably inventive concept.

Zooming out to the "ordered combination" of the '863 Patent's eleven steps, *see Two-Way Media*, 874 F.3d at 1339 (citing *BASCOM*, 827 F.3d at 1350), there is still no arguably inventive concept. Authentixx makes no argument that an inventive concept lies in the ordering of the '863 Patent's eleven steps. Nor could it, because the eleven result-based steps are all simply done in their logical order: the webpage must receive a request for a key (Step E) before it provides the key (Step G), which must be done before the provided key is processed to determine a location (Step H), which must be done before locating the location (Step I), which must be done before retrieving something from that location (Step J), which must be done before the retrieved item is enabled to be displayed (Step K). Before all of that, the item to eventually be located, retrieved, and displayed must have been stored somewhere (Step A) and the key to finding it must be created (Step B). Likewise, for the

generic webpage content, a request for a webpage must be received (Step C) before formatted data corresponding to the request can be created (Step D), which must happen before it can be sent (Step F). No arguably inventive concept lies in breaking down the big-picture abstract idea of simultaneous display into these granularized subcomponents, which are ordered in a necessarily logical fashion that does nothing to teach how to actually accomplish the big-picture idea.

Authentixx's entire argument at *Alice* step two is that whether the '863 Patent's claimed method is "well-known, routine, and conventional" is a factual question on which the Court must defer to Authentixx's allegations. *See* Doc. 18, Resp., 17–21. The factual question identified by Authentixx is about novelty under § 102, which is a separate inquiry from eligibility under § 101. *See Two-Way Media*, 874 F.3d at 1340 (citation omitted) ("Eligibility and novelty are separate inquiries."). True, determining eligibility at *Alice* step two "might sometimes overlap" with novelty. *Berkheimer*, 881 F.3d at 1368 (citation omitted). But the overlap only occurs when the claims contain arguably inventive concepts that must be compared to the prior art to determine if they are actually inventive (*i.e.*, novel and non-obvious). *See id.* at 1368–69. There is not even an arguably inventive concept here because, scrutinized step-by-step or considered as an "ordered combination," the '863 Patent claims no more than the abstract idea of authenticating a webpage by simultaneously displaying generic content with user-specific content. Even if no one before thought of that abstract idea, "[a] claim for a *new* abstract idea is still an abstract idea." *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1318 (Fed. Cir. 2021) (quoting *SAP Am.*, 898 F.3d at 1163). Thus, this case is not one where reference to the prior art is necessary to reach the conclusion that the '863 Patent is ineligible for patent protection.

At bottom, the method in the '863 Patent is "'so abstract and sweeping' as to cover any and all uses of" its simultaneous-display abstract idea. *See Digitech*, 758 F.3d at 1351 (citation omitted). A good clue to that conclusion: the only place in Authentixx's Amended Complaint that provides a glimpse into the technical steps used to achieve the simultaneous-display result comes from Pickleball's website. *See generally* Doc. 15-2, Am. Compl. Ex. 2. Yet those technical steps—such as using a portion of the URL string as the "authenticity key," *id.* at 4–5—are never specified by the '863 Patent. By saying "creat[e]" the authenticity key in Step B, the '863 Patent merely provides the "desired results (functions)." *See Elec. Power Grp.*, 830 F.3d at 1356. *Any* "particular way[] of achieving (performing)" that result—Pickleball's or otherwise—would be barred by the '863 Patent if it were deemed valid. *See id.* The upshot would be monopolization of an idea, depriving every inventor of this "basic tool[] of . . . technological work" and "thereby thwarting the primary object of the patent laws" to "promote the Progress of Science." *See Alice*, 573 U.S. at 216 (citations omitted). The '863 Patent therefore "never should have issued in the first place" and must be deemed ineligible now. *See Cellspin*, 927 F.3d at 1319 (citation omitted).

C.      *Leave to Amend Would be Futile.*

"Whether leave to amend should be granted is entrusted to the sound discretion of the district court, and that court's ruling is reversible only for an abuse of discretion." *Young v. U.S. Postal Serv. ex rel. Donahoe*, 620 F. App'x 241, 245 (5th Cir. 2015) (citation omitted). "Denial of leave to amend is appropriate where there is no indication that amendment would cure the defects in a complaint." *Id.* Authentixx's Amended Complaint was aimed particularly at highlighting the purported inventiveness of the '863 Patent, but not once did it come close to pushing the claimed

method beyond a mere abstract idea. The Court can safely conclude that the '863 Patent is ineligible for patent protection, and allowing Authentixx another chance at pleading would be futile.

## IV.

## CONCLUSION

Pickleball's Motion to Dismiss (Doc. 17) is **GRANTED** because the '863 Patent claims a patent-ineligible abstract idea. A final judgment will follow.

SO ORDERED.

SIGNED: June 26, 2026.

_____
JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE